**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ron TAVOR,<br><br>        Plaintiff,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY, et al.,<br><br>        Defendants. | No. CIV 05-2867-PHX-SMM<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

The Court granted the parties' request to render a decision based on the pleadings to date. (See Dkt. 33, Order dated Aug. 8, 2007.) Having reviewed the pleadings and briefs filed in this matter, the Court now issues this ruling.

**FINDINGS OF FACT**

**A. Factual Background**

Plaintiff Ron Tavor ("Plaintiff") was an employee of Kodak Polychrome Graphics, LLC ("Kodak"), and a participant in Kodak's employee welfare benefit plan ("the Plan"). The Plan included short-term disability ("STD") and long-term disability ("LTD") benefits. Defendant Aetna Life Insurance Company ("Aetna") processes claims, pays benefits, and

makes benefit determinations under the Plan. (Dkt. 16, Answer ¶ 5.)  Kodak is the Plan Administer.[1]

### B. Payment and Termination of STD Benefits

On December 17, 2001, Plaintiff undertook an initial consultation with Dr. Lawrence Metrick regarding lower back pain down Plaintiff's left leg.  An x-ray revealed degenerative spur changes and decreased curve lumbosacral spine. (AET 00169-00170.)  A cortisone shot received by Plaintiff a few days later improved the pain, but Plaintiff still experienced discomfort while walking. (AET 00170.)  A MRI taken January 16, 2002 indicated that Plaintiff suffered from avascular necrosis. (AET 00171.)  A subsequent bone scan was consistent with the MRI. (AET 00172.)  Plaintiff continued to experience discomfort when he attempted to walk. (Id.)  Dr. Metrick prepared a noted dated January 28, 2002 stating that Plaintiff could not return to work for six weeks. (AET 00222.)

Plaintiff submitted an application for STD benefits to Aetna on January 29, 2002. (See AET 00220.)  After requesting and receiving additional information, Aetna approved STD benefits effective February 4, 2002 through February 24, 2002. (AET 00201.)  STD benefits were later extended through March 31, 2002; due to a previous disability claim, no further STD payments would be made after that date. (AET 00212.)  Plaintiff appealed that decision (see AET 00093), but Aetna upheld the original decision to deny further STD payments.[2] (AET 00088-00089.)

---

[1] The Plan refers to Kodak as the "Plan Administer," rather than the more common "plan administrator."

[2] The record is unclear as to the exact date on which Plaintiff's STD benefits ceased.  The letter upholding denial states that Plaintiff is "not eligible for any further payment of STD benefits after February 24, 2002." (AET 00088.)  That same letter states that Plaintiff was paid another eight weeks of STD benefits from January 25, 2002 through February 24, 2002—a period of approximately four weeks.  The initial letter approving STD benefits states that the eight weeks of remaining STD payments would end March 31, 2002—a period of approximately nine weeks from January 25, 2002. (AET 00201; see also AET 00212.)  As Plaintiff's claim is for termination of LTD benefits and not STD benefits, the Court need not resolve this ambiguity. (See Dkt. 14, First Am. Compl. ¶ 12 (acknowledging that STD

- 2 -

### C. Payment and Termination of LTD Benefits

On March 13, 2002, Plaintiff faxed Aetna a note indicating he had been diagnosed with "AVN left hip" and that Plaintiff was unable to work for three months. (AET 00210.) Aetna advised Plaintiff that LTD benefits required a waiting period of 26 weeks, retroactive to the date of his disability—January 28, 2002. (AET 00103.) After that waiting period, Aetna would request and review Plaintiff's medical information to determine whether he remained totally disabled. (Id.) Plaintiff continued to see Dr. Metrick and was also examined by an orthopedic surgeon in Israel. (AET 00174-00175, 00187.) Both stated that Plaintiff could not return to work for a period of time.

On June 13, 2002, Dr. Metrick signed a "Disability Attending Physician's Statement," diagnosing Plaintiff with "aseptic necrosis of [left] hip." (AET 00153-00154.) Dr. Metrick assessed Plaintiff as "improved" and "ambulatory," but that Plaintiff should use a cane or crutch. (AET 00153-00154.) Dr. Metrick classified Plaintiff's physical impairment at a "Class 4" level on a scale of increasing severity from Class 1 to Class 5: "[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity. (60-70%)," with no stress to be placed on his left hip. (AET 00154.) Dr. Metrick indicated that Plaintiff's prognosis was "fair," but deferred any prognoses on when Plaintiff's maximum medical improvement would be reached, the estimated date of Plaintiff's return to work, and whether Plaintiff was a viable candidate for vocational rehabilitation (job retraining). (Id.)

On July 24, 2002, Aetna determined that Plaintiff was totally disabled from his usual occupation under the terms of the Plan, and was eligible for monthly disability payments of $3,414 per month beginning July 29, 2002. (AET 00110-00111.) Plaintiff would remain eligible for payments for up to 24 months so long as he remained disabled from his usual occupation. (AET 00110.) After 24 months of LTD payments the Plan requires that a participant meet a stricter "any occupation" definition of totally disabled, defined as "unable

---

benefits "ceased due to [Plaintiff] having exhausted the STD Plan's provision for . . . STD benefits.").)

- 3 -

1  to perform all the material duties of any job" for which the participant is qualified for, or may
2  become qualified for by training, education, or experience. (Id.) The Plan authorizes
3  payment of LTD benefits to a disabled participant until the participant reaches the age of 65,
4  or is no longer disabled for purposes of LTD benefits. Plaintiffs condition would be assessed
5  to determine whether, after 24 months of receiving LTD benefits, Plaintiff's condition
6  prevented him from performing the duties of "any occupation" and not just his usual
7  occupation. Aetna also informed Kodak that Plaintiff's claim for LTD benefits had been
8  approved. (AET 00094.)

9  Plaintiff continued to seek medical treatment for his left hip and other ailments. Dr.
10 Metrick signed another Disability Attending Physician's Statement on September 5, 2002
11 repeating the diagnosis, assessments, and prognoses found in the June 13, 2002 Statement.
12 (AET 00152.) Dr. Metrick referred Plaintiff for another MRI, conducted September 26,
13 2002. (AET 00180.) The results of that MRI showed significant improvement since the
14 previous MRI taken January 16, 2002, and suggested "that the findings may have been due
15 to transient osteoporosis at the left hip and/or insufficiency of fracture/osteochondral injury
16 (rather than avascular necrosis)." (Id.)

17 Dr. Metrick reviewed the MRI results with Plaintiff during a October 24, 2002 visit.
18 (AET 00177.) Despite the significant improvement indicated by the MRI report, Plaintiff
19 stated that his hip was hurting more. (Id.) Dr. Metrick referred the MRIs and other
20 documents to Dr. Marty Lazarus for his opinion. (Id.) On October 28, 2002, Dr. Lazarus
21 agreed with the September 26, 2002 findings of significant improvement, and felt that the
22 findings represented "cessation/resolution of AVN as opposed to transient osteoporosis," and
23 that osteochondral fracture was less likely. (AET 00184.) Dr. Metrick discussed Dr.
24 Lazarus's report with Plaintiff during a December 2, 2002 visit. (AET 00177.) Plaintiff felt
25 "improved," but could not stand for any length of time and twisting his leg still caused
26 discomfort. (Id.) Plaintiff stated that he had considered going on some job interviews, but
27 that "he just can't do it" because of the travel requirements. (AET 00178.) Dr. Metrick
28 continued to believe that Plaintiff was not ready to return to work. (Id.)

1    Plaintiff visited Dr. Metrick again on April 11, 2003 and reported greatly increased
2 pain in his left hip radiating down the anterior thigh toward the knee. (AET 00178.) An x-
3 ray taken that day showed no evidence of an acute fracture, subluxation, or asymmetric hip
4 joint effusion. (AET 00183.) Plaintiff had lost a significant amount of weight, and was
5 disappointed that the weight loss did not relieve the pain. (AET 00178-00179.) Dr. Metrick
6 advised Plaintiff that the weight loss could be beneficial if he required a hip replacement.
7 (AET 00179.) Dr. Metrick signed another Disability Attending Physician Statement dated
8 April 13, 2003, reiterating the same findings: diagnosis of aseptic necrosis in the left hip;
9 improved progress, ambulatory; Class 4 physical impairment, capable of
10 clerical/administrative (sedentary) activity with no undue stress on the left hip; fair prognosis
11 with other prognoses deferred. (AET 00205-00206.)

12    On May 14, 2003, Plaintiff submitted a "Work History and Education Questionnaire"
13 to Aetna. (AET 00195 (double sided document).) Plaintiff indicated that he had received
14 a degree in computer science and had worked as a Senior Application Specialist since his
15 hiring date of August 1990. (Id.) Plaintiff's condition prevented him from performing job
16 duties of "computer hookup, networking, training, calibration." (Id.) Plaintiff had previously
17 been employed as a tech support and quality control manager at Price Electronic, where he
18 had been trained in computer installations. (Id.) Plaintiff's disability prevented him from
19 engaging in tennis, sailing, and softball—activities he had engaged in before the disability.
20 (Id.) Plaintiff also submitted an "Other Income Questionnaire" certifying that he was
21 receiving no other income. (AET 00196.)

22    Plaintiff underwent another MRI on August 16, 2003 which revealed "a small focus
23 of abnormal signal intensity involving the left femoral head consistent with a small focus [of]
24 osteonecrosis." (AET 00438.) Plaintiff visited Dr. Metrick on August 18, 2003, complaining
25 of discomfort in his left hip. (AET 00462.) Plaintiff stated that acupuncture received at the
26 weight reduction facility tended to reduce the pain. (Id.) Plaintiff's treatment remained the
27 same and Plaintiff was instructed to be cautious with activities. (AET 00463.)
28

- 5 -

1    Dr. Metrick submitted another evaluation form to Aetna on September 25, 2003. (AET 00126-00128; AET 00707-710.)  Dr. Metrick stated that Plaintiff was able to do sedentary work activity with moderate limitation of functional capacity, exerting up to ten pounds of force occasionally, with no stress, bending, or kneeling.  (AET 00709.)  Dr. Metrick further stated that Plaintiff was capable of working four hours per day, four to five days a week, divided between two hours sitting, one hour standing, and one hour walking.  (Id.)  Plaintiff's status was again listed as "improved."  (Id.)

On October 27, 2003, Aetna submitted a "Disability SIU Request" asking for surveillance of Plaintiff.  (AET 00079-00081.)  Crawford Investigation Services performed a three-day surveillance of Plaintiff at Plaintiff's residence in Arizona from November 20, 2003 to November 22, 2003.  Plaintiff had recently moved to Arizona from North Carolina to see if the change in weather would improve his condition.  (See AET 00464.)  The investigator watched Plaintiff's residence from 7:00 am to 4:00 pm each day.  (AET 00077-00078.)  Plaintiff was in the residence during the surveillance, but the investigator did not observe any activity; the investigator noted that Plaintiff "might have been conscious of surveillance efforts."  (AET 00077-00078.)

On January 21, 2004, Aetna informed Plaintiff that it was investigating whether Plaintiff would remain disabled from any reasonable occupation after July 29, 2004.  (AET 00072.)  Aetna also asked Plaintiff to complete a Functional Capacity Evaluation ("FCE") to determine his level of physical impairment.  (AET 00074.)  Plaintiff expressed concern about having a physical therapist rather than a medical doctor perform the FCE, and objected to the proposed FCE date.  (AET 00524-00525.)  On March 23, 2004, Plaintiff sent a letter to Aetna's president indicating that he lacked confidence in Aetna and its representatives, and believed Aetna was trying to deny Plaintiff benefits to which he was entitled.  (AET 00494-00495.)

On April 30, 2004, Plaintiff signed a Long Term Disability Employee Questionnaire and advised Aetna that he was represented by counsel.  (AET 00013-00014, 00365-68.)  Plaintiff indicated that he could not perform any of the tasks of his previous occupation and

- 6 -

1  relied on a friend to assist with errands. (AET 00013.) Plaintiff further indicated that he
2  could handle 30-45 minutes of sitting, 15-30 minutes of walking, and 30 minutes of grocery
3  shopping per day. (Id.) Plaintiff expressed his intention to return to work upon improvement
4  of his condition and physician's approval. (AET 00014.)

5  On May 20, 2004, Plaintiff reported to Dynamic Rehab Physical Therapy for his FCE.
6  (AET 00129-00130.) Plaintiff reportedly gave a "self-limited effort," and declined to
7  perform the following exercises due to his reported hip pain: climb stairs, stoop, crouch,
8  kneel, and shoulder to overhead. (AET 00129.) Plaintiff's hip pain also caused him to
9  complete only one of three trials of carrying an empty crate weighing one pound, and of
10 immediate reaching with to his right side. (AET 00146, 00149.) The physical therapist who
11 conducted the FCE concluded that Plaintiff's functional capacities were "within the
12 Sedentary physical demand classification for a standard eight-hour day." (AET 00130.)
13 However, Plaintiff's condition limited his ability to sustain a sitting position for greater than
14 10 to 15 minutes at a time and Plaintiff demonstrated difficulty standing due to an inability
15 to bear weight evenly on his legs and feet. (Id.) Plaintiff's duration of function decreased
16 during testing, pain complaints remained constant, and as a result Plaintiff requested more
17 frequent rest breaks. (Id.) Dr. Metrick's requests for a copy of the FCE report were denied
18 on the grounds that the case was still open.

19 On June 8, 2004, Plaintiff met with Dr. Metrick. (AET 00465.) Plaintiff felt better
20 due to the weather in Phoenix, but was still limited physically. (Id.) When Plaintiff walked
21 3,000 paces, his pain increased and caused him to stop or sit down. (Id.) Plaintiff knew he
22 was improved, but did not want surgery; Dr. Metrick stated that Plaintiff was not a candidate
23 for surgery. (Id.) Plaintiff knew he could not stand or sit all day and would have to alternate,
24 and the question remained whether Plaintiff could work four-, six-, or eight-hour days. (Id.)
25 Plaintiff was "apprehensive as to what he could or could not do. He certainly knows at this
26 point he is most likely unable to put in a decent day's work in a structured environment."
27 (Id.)
28

On June 29, 2004, Aetna sent Plaintiff a letter advising him that his LTD benefits were being terminated effective July 28, 2004. (AET 00422-00424.) Aetna identified the following occupations available within Plaintiff's geographic area and physical limitations: Sales Manager; Computer Systems Analyst; Network and Computer Systems Administrator; and Production Planning and Expediting Clerk. (AET 00423.) A registered nurse employed by Aetna reviewed Plaintiff's records and concurred with the FCE that Plaintiff was able to perform sedentary work. (AET 00509-00510.)

Plaintiff retained counsel and requested an appeal of the LTD benefits termination. (AET 00005-00006.) Aetna forwarded a copy of Plaintiff's file, but did not provide a copy of the Plan or the FCE. (AET 00007.) Aetna stated that it was not the Plan Administer and recommended contacting Kodak for a complete copy of the Plan. (Id.) Aetna provided a copy of the FCE report on December 29, 2004. Plaintiff then served a formal notice of appeal to Aetna's Central Appeals Unit. (AET 00471.) After reviewing the records, including additional records submitted by Plaintiff, Aetna notified Plaintiff's counsel of its decision to uphold termination of LTD benefits. (AET 00474.) Aetna also advised Plaintiff of his right to bring an action under Section 502(a) of ERISA.

**B. Procedural Background**

Plaintiff commenced this action against Aetna and Kodak on September 19, 2005. (Dkt. 1, Compl.) Plaintiff then filed a First Amended Complaint ("FAC") which dismissed Kodak as a defendant, eliminated a claim for breach of fiduciary duty, and withdrew Plaintiff's demand for a jury trial. (Dkt. 14, FAC at 1.) The Court subsequently granted the parties' request to vacate oral argument and submit the matter based on the pleadings filed to date. (Dkt. 33.)

This Court has jurisdiction pursuant to section 502(e) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e), (f). Venue in the District of Arizona is proper under 29 U.S.C. § 1132(e)(2) because the alleged breach occurred in Arizona and because Aetna conducts business and may be found in Arizona.

//

**STANDARD OF REVIEW**

The standard of review in ERISA claims depends on the role of the plan administrator or fiduciary. When a plan does not confer discretion upon a plan administrator or fiduciary to determine eligibility for benefits or to construe the terms of the plan, district courts should review the denial of benefits de novo. Firestone Tire & Rubber Co. v. Brush, 489 U.S. 101, 115 (1989). If the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, denial of benefits should be reviewed for abuse of discretion. Id.

ERISA defines a fiduciary as one who "(I) exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation . . ., or (iii) has any discretionary authority or discretionary responsibility in the administration of [the] plan." 29 U.S.C. § 1102(21)(A). An entity or person is thus a fiduciary to the extent it exercises any discretionary authority or control. Firestone, 489 U.S. at 113. A plan administrator or fiduciary has discretion only where discretion is "unambiguously retained" by the administrator or fiduciary. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

**CONCLUSIONS OF LAW**

**A. The Appropriate Standard of Review**

The parties dispute which standard of review should be applied in this case. Plaintiff asserts that the appropriate standard of review is de novo because Aetna's role is ambiguous. (Dkt. 26, Pl.'s Trial Br. 22-24.) Aetna stated that it was "not the Plan Administer" (AET 00007), and thus it is uncertain who functioned in the capacity of Plan Administrator. (Pl.'s Trial Br. at 23:16-24.) Aetna concedes that Kodak is the Plan Administrator, but argues that abuse of discretion applies because Aetna is nonetheless a "fiduciary" as defined by ERISA. (Dkt. 27, Def.'s Resp. Trial Br. 2-4.) Abuse of

1  discretion therefore applies, Aetna asserts, because the Plan unambiguously delegates
2  authority to Aetna.  (Dkt. 25, Def.'s Trial Br. 26; Def.'s Resp. Trial Br. at 3-4.)  The
3  Court finds that although Aetna is a fiduciary under ERISA, the Plan does not
4  unambiguously grant Aetna discretionary authority.  Therefore de novo review applies.
5  Firestone, 489 U.S. at 115.

6        "When an insurance company administers claims for an employee welfare benefit
7  plan and has authority to grant or deny the claims, the company is an ERISA 'fiduciary'
8  under 29 U.S.C. § 1002(21)(A)(iii)."  Aetna Life Ins. Co. v. Bayona, 223 F.3d 1030, 1033
9  (9th Cir. 2000) (citations omitted).  In Bayona, Aetna was found to be a fiduciary because
10 it made decisions regarding claims to life insurance money and because the claimant
11 directed her correspondence concerning the policy to Aetna, rather than any other plan
12 entity.  Id.  In the instant case, Aetna approved payments, arranged for the FCE,
13 determined whether Plaintiff was unable to perform the duties of his employment,
14 terminated LTD benefits, and reviewed Plaintiff's records.  (Pl.'s Trial Br. at 9-10, 15, 16,
15 19.)  Additionally, Plaintiff's correspondence regarding the Plan were directed to Aetna.
16 (Id. at 9-10.)  Furthermore, the Plan documents state that "[Kodak] hereby delegates to
17 Aetna U.S. Healthcare authority to make determinations on behalf of [Kodak] with
18 respect to disability certifications under the Plan.  In connection with such determinations,
19 [Aetna] acknowledges that it is acting as a fiduciary solely for benefit determinations and
20 review of denied claims for benefits under ERISA."  (AET 00063.)  Aetna is accordingly
21 an ERISA fiduciary.

22       Determining that Aetna is a fiduciary does not end the analysis regarding the
23 appropriate standard of review.  De novo review is still the default setting and applies if a
24 plan does not confer "discretionary authority to determine eligibility for benefits or to
25 construe the terms of the plan."  Firestone, 489 U.S. at 115.  A court reviews for abuse of
26 discretion only when discretionary authority is "unambiguously retained."  Kearney, 175
27 F.3d at 1090.
28

- 10 -

1    Plan language is insufficient to confer discretionary authority when it does not
2 grant any power to construe the terms of the plan. Abatie, 458 F.3d at 964 (citing Ingram
3 v. Martin Marietta Long Term Disability Income Plan, 244 F.3d 1109 (9th Cir. 2001)). In
4 Ingram, the plan stating "the carrier will make all decisions on claims" only allocated
5 responsibility for administrative decisions. 244 F.3d at 1112. "An allocation of decision-
6 making authority . . . is not, without more, a grant of discretionary authority in making
7 those decisions." Id. at 1112-13. The further statement granting authority over "the
8 review and payment or denial of claims and the full and fair review of claim denial" was
9 found to "add[] nothing." Id. at 1113. The court held that the text of the plan did not
10 unambiguously state that the plan administrator had discretionary authority to grant or
11 deny benefits. Id.

12    On the other hand, plans which grant the power to interpret plan terms and to make
13 final benefits determinations confer discretionary authority on the fiduciary. Abatie, 458
14 F.3d at 963. In Abatie, the plan bestowed the responsibility to interpret the terms of the
15 plan and to determine eligibility for benefits. Id. at 965 (emphasis original). The plan
16 gave the administrator "full and final" authority, and cautioned that the authority "rests
17 exclusively" with the plan administrator. Id. These provisions "clearly gave to the
18 administrator the power to decide according to its own judgment." Id.

19    Under these precedents, the Plan does not unambiguously retain discretion on the
20 part of Aetna. The Plan states that "[Kodak] hereby delegates to Aetna U.S. Healthcare
21 authority to make determinations on behalf of [Kodak] with respect to disability
22 certifications under the Plan." (AET 00063.) The import of Ninth Circuit precedent is
23 that a plan must either confer power to interpret the terms of the plan, or must confer
24 plenary authority over benefits determinations. See, e.g., Abatie, 458 F.3d at 965; see
25 also Firestone, 489 U.S. at 115. In either case, the discretionary authority must be
26 unambiguously retained. Kearney, 175 F.3d at 1090.

27    Conferring discretionary authority does not require the invocation of certain
28 "magic" words. Abatie, 458 F.3d at 963. But the Plan language is insufficient to warrant

- 11 -

1    a deferential abuse of discretion standard of review.  The Plan does not confer to Aetna
2    the power to interpret any of its terms of the Plan.  Cf. id. at 964 ("We have held that
3    ERISA plans are insufficient to confer discretionary authority on the administrator when
4    they do not grant any power to construe the terms of the plan.").  Therefore the Plan must
5    confer discretionary authority to determine eligibility to avoid de novo review.  The
6    language delegating "authority to make determinations . . . with respect to disability
7    certifications" parallels the language which encompassed only "administrative decisions."
8    Ingram, 244 F.3d at 1112-13.  Thus a delegation of decision-making authority to Aetna is
9    not, without more, a grant of discretionary authority in making those decisions.  Id.

10   At best, the Plan is ambiguous as to the whether Aetna's authority is discretionary
11   or administrative. Accordingly, the Court will review denial of Plaintiff's LTD benefits
12   de novo because the Plan does not unambiguously retain discretionary authority on the
13   part of Aetna.  The standard of review does not affect the outcome in this case because
14   even under de novo review Plaintiff is not entitled to relief.

15   **B. Termination of Benefits**

16   A de novo review of the administrative record and the parties' trial briefs confirms
17   that termination of Plaintiff's LTD benefits was justified.  Plaintiff was not "totally
18   disabled" as defined by the Plan.  This finding is supported by the FCE and evaluations
19   by Plaintiff's treating physicians.  Plaintiff fails to provide any evidence that he is unable
20   to perform the duties of "any occupation."

21   After 24 months of receiving LTD benefits, the Plan defines "total disability" as
22   being unable, "solely because of injury or disease, to work at any reasonable occupation."
23   (AET 00057.)  A "reasonable occupation" is defined as a position for which the
24   participant is qualified, or may become qualified by training, education, or experience.
25   (Id.)  Under ERISA, Aetna was required to apply the terms of the Plan in handling
26   Plaintiff's claim.  See 29 U.S.C. § 1104(a)(1)(D).  Plaintiff's argument that total disability
27   should be defined according to Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d
28   998, 1006 (9th Cir. 2004) is misguided.  Hangarter did not involve a claim for ERISA

1  benefits.  Rather, it required the application of California law in a diversity suit for breach
2  of contract and other state law claims.  Hangarter, 373 F.3d at 1003.  In contrast, "the
3  interpretation of ERISA insurance policies is governed by a uniform federal common
4  law."  Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1439 (9th Cir. 1990); see also
5  McClure v. Life Ins. Co. of N. Am., 84 F.3d 1129, 1133 (9th Cir. 1996)("Under ERISA,
6  state law does not control the construction of the [benefits] policy.").  Therefore the
7  definition applied in Hangarter is not relevant to this decision.  Aetna's use of the Plan
8  definition was therefore proper.  Cf. Madden v. ITT Long Term Disability Plan for
9  Salaried Employees, 914 F.2d 1279, 1286 n.6 (9th Cir. 1990).  As Plaintiff had received
10 LTD benefits for 24 months, continued benefits payments require that he be "totally
11 disabled" as defined by the Plan.
12         The results of the FCE state that Plaintiff is capable of sedentary work, alternating
13 between sitting and standing.  (AET 00130.)  This is consistent with Dr. Metrick's
14 follow-up evaluation of June 8, 2004.  Dr. Metrick noted the same limitations, but did not
15 opine as to whether Plaintiff could work a four-, six-, or eight-hour day.  (AET 00465.)
16 Dr. Metrick further stated that Plaintiff was capable of working four hours per day, four
17 to five days a week, divided between two hours sitting, one hour standing, and one hour
18 walking.  (Id.)  Throughout Plaintiff's treatment, Dr. Metrick's evaluations consistently
19 classified Plaintiff's condition as capable of sedentary work activity with moderate
20 limitation of functional capacity.   (AET 00154 (evaluation dated June 13, 2002); AET
21 00205-00206 (evaluation dated Apr. 13, 2003); AET 00709 (evaluation dated Sept. 25,
22 2003).)  Other doctors who reviewed Plaintiff's records and MRIs, such as Dr. Lazarus,
23 also noted significant improvement in Plaintiff's condition.  (E.g., AET 00184.)
24 Although Dr. Metrick stated in June 2004 that Plaintiff could not work a full day in a
25 "structured work environment" (AET 00465), Plaintiff has not provided evidence that the
26 potential jobs identified by Aetna entail such an environment.
27         Under the Plan, Plaintiff must be unable to perform the material duties of any
28 reasonable occupation for which he is qualified or could become qualified through

education, training or experience. (AET 00057.) Aetna noted four jobs for which Plaintiff is capable of performing: sales manager; computer systems analyst; network and computer systems administrator; and production planning and expediting clerk. (AET 00423.) Plaintiff states that he was not able to secure any position as a sales manager because he has virtually no sales experience. (Pl.'s Trial Br. 29:1-3.) However, Plaintiff fails to show that he could not become qualified through education or training. Plaintiff states that he could not secure work as a computer systems analyst or administrator because "he has no computer systems experience and has no aptitude for computer systems analysis." (Id. at 29:3-5.) This contradicts the Work History and Education Questionnaire signed by Plaintiff, in which he states that he received a degree in computer science, that his responsibilities at Kodak included "computer hookup, networking, calibration, training," and that his previous job at Price Electronic provided training in computer installations. (AET 00195.) Moreover, Plaintiff could become qualified for those jobs by further education or training. Finally, Plaintiff states that work as a production planning and expediting clerk is not feasible because "in *any* industry . . . these positions always require extreme mobility." Plaintiff does not provide any support for this contention.[3] Regardless, Plaintiff is or could become qualified for the computer and sales manager positions.

Plaintiff obliquely references Aetna's failure to determine whether Plaintiff suffered "partial disability." (See Pl.'s Trial Br. 27:1-4, 27:28-28:3, 29:15-17.) Plaintiff seems to be arguing that Aetna should have determined whether Plaintiff remained partially disabled before terminating his LTD benefits. The Plan states that a participant may become eligible for LTD benefits if the participant meets the Plan's definition of partially disabled. (AET 00025.) However, the Plan states that LTD benefits will end on the date that the participant is no longer totally disabled (AET 00032); thus a participant's

---

[3] Plaintiff similarly asserts, without citing any supporting evidence, that he attempted and failed to work in four different jobs: marketing consultant for a mortgage company; web page analyst; sales associate; and training. (Pl.'s Trial Br. 29:7-12.)

- 14 -

1  partial disability will not qualify them for continued benefits.  Plaintiff was notified upon
2  approval of his application for LTD benefits that he would need to meet the more strict
3  "any occupation" definition of disability in order to receive LTD benefits after July 29,
4  2004.  (AET 00110.)  Moreover, Plaintiff sought and received LTD benefits on the
5  grounds that he was totally disabled, not partially disabled.

## ORDER

Based on the foregoing de novo review of the administrative record in this case, the Court finds that Plaintiff was not entitled to continue receiving LTD benefits after July 28, 2004.  The FCE and other medical information indicates that Plaintiff was not "totally disabled" as defined by the Plan, and Plaintiff failed to provide any evidence that he is unable to perform the duties of "any occupation."  Therefore Aetna did not violate ERISA or the terms of the Plan when it terminated Plaintiff's LTD benefits.  Judgment shall be entered in favor of Aetna.

Accordingly,

**IT IS HEREBY ORDERED** entering judgment in this matter in favor of Defendant Aetna Life Insurance Company.  Plaintiff shall take nothing, and the Clerk of the Court shall terminate this matter.

DATED this 4th day of March, 2008.

Stephen M. McNamee
United States District Judge